**ARICA INSTITUTE, INC.,**
**Plaintiff–Appellant,**

v.

**Helen PALMER and Harper & Row Publishers, Incorporated,**
**Defendants–Appellees.**

**No. 771, Docket 91–7859.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 30, 1992.

Decided July 22, 1992.

Arthur J. Ginsburg, Steven C. Beer and Kyran Cassidy, of counsel, Frankfurt, Garbus, Klein & Selz, P.C., New York City, for plaintiff-appellant.

Richard Dannay and David O. Carson, of counsel, Schwab, Goldberg, Price & Dannay, New York City, for defendants-appellees.

Before: VAN GRAAFEILAND, WALKER and McLAUGHLIN, Circuit Judges.

JOHN M. WALKER, Circuit Judge:

Plaintiff-appellant Arica Institute, Inc. appeals from a judgment of the United States District Court for the Southern District of New York (Patterson, J.) entered August 8, 1991 granting summary judgment to defendants-appellees Helen Palmer and Harper & Row Publishers, Inc., and dismissing the complaint against them which alleged violations of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, the Lanham Trademark Act, 15 U.S.C. § 1051 *et seq.*, and common law unfair competition and palming off. Affirmed.

## BACKGROUND

The facts of this case are fully reported at 761 F.Supp. 1056 (S.D.N.Y.1991). We briefly summarize those facts most relevant to this appeal.

Plaintiff-appellant Arica Institute, Inc. ("Arica") is a not-for-profit educational institution which provides trainings based on the work of the Institute's founder: Oscar Ichazo ("Ichazo"), himself a student of Zen, Sufism, Yoga, Buddism, Confucianism, I Ching, and the Kabbalah. According to the affidavit of Arica's Executive Director Elliot Dunderdale:

The Arica system constitutes a body of practical and theoretical knowledge in the form of a nine-level hierarchy of

training programs aimed at the total development of the human being.... The Arica system observes that the human body and psyche is composed of nine independent yet interconnected systems. Particular imbalances within these systems are called "fixations".... These nine separate components are represented by enneagons—nine pointed figures that map the human psyche. Ichazo writes that there are seven fundamental enneagons associated with the nine ego fixations. Thus, the enneagons constitute the structural maps of a human psyche ... [and] provide a guide through which a person may better understand oneself and one's interactions with others.... An ego fixation is an accumulation of life experience organized during one's childhood and which shapes one's personality. Arica training seeks to overcome the control and influence of the ego fixations so that the individual may return to the inner balance with which he or she was born.

Ichazo's "enneagons," central to this lawsuit, are nine-pointed figures, enclosed in a circle, with straight lines connecting each point to two others. Each point corresponds to a given "ego fixation" as represented in the following enneagon of the Fixations:

FIXATIONS

Ichazo, *Interviews with Oscar Ichazo* 15 (1982) (hereinafter, *"Interviews"*). The six

other fundamental enneagons portray qualities of the nine fixations in labels attached to the point associated with that fixation. For example, the following enneagon of the Passions indicates that the dominant passion of the "Indolent" fixation (the top point on the enneagon) is "Laziness," that of the "Resentment" fixation is "Anger," that of the "Flattery" fixation is "Pride," and so on:

PASSIONS

Ichazo, *Interviews* at 18. Arica uses the seven fundamental enneagons to teach its students the qualities associated with their particular ego fixation.

Ichazo held his first training in Arica, Chile in 1971, the year of the Arica Institute's New York State incorporation. Today there are forty or so Arica training centers, located in the United States, South America, Europe and Australia. Arica also holds copyrights in approximately forty-seven training manuals, books, and journals ("the copyrighted materials"). With minor exceptions, including *Interviews*, Arica limits distribution of its copyrighted materials to training participants who must return them after use.

Arica claims that defendants-appellees Helen Palmer ("Palmer") and Harper & Row, the author and publisher respectively of *The Enneagram: Understanding Yourself and the Others in Your Life* *("The Enneagram")*, have infringed on its copyrights. Palmer holds a Masters de-

gree in clinical psychology, and teaches at a private college in California and at the Center for the Investigation and Training of Intuition (CITI) in Berkeley, California, an institution which she founded and which provides "intuition training." Her first book, *The Enneagram*, runs 392 pages. HarperCollins (successor-in-interest to Harper & Row, Inc.), published the book in hardcover in November, 1988, and in paperback in 1991.

*The Enneagram*, as its title would suggest, takes as its principle subject the nine-pointed figure which Ichazo also utilized, the terms "enneagon" and "enneagram" being, for our purposes, interchangeable. The opening paragraph sets forth the book's scope:

> The Enneagram is an ancient Sufi teaching that describes nine different personality types and their interrelationships. The teaching can help us to recognize our own type and how to cope with our issues; understand our work associates, lovers, family, and friends; and to appreciate the predisposition that each type has for higher human capacities such as empathy, omniscience, and love. This book can further your own self-understanding, help you work out your relationships with other people, and acquaint you with the higher abilities that are particular to your type of mind.

Part I, entitled "Orientation to the Enneagram," includes chapters on "The Background of the [Enneagram] System and Introduction to Type," "The Structure of the Enneagram Diagram," and "Contributors to the System," the last of which discusses Ichazo's work. Part II, entitled "The Nine Points of the Enneagram," comprises nine chapters each examining a given personality type (Palmer's term for an ego fixation) and beginning with a banner listing of the attributes associated with that type. Enneagram figures appear at various points, most notably at page 50 where there are seven enneagrams, six virtually identical to their Ichazo counterparts.

Palmer identified as her principal source Claudio Naranjo, a psychologist with whom Palmer studied beginning in 1973. Naranjo attended Ichazo's 1971 training in Arica, Chile, but shortly thereafter separated from Ichazo, apparently over his desire to apply more contemporary psychological ideas to Ichazo's material. Palmer testified that her other sources included: *Interviews;* a chapter from *Transpersonal Psychologies* (Charles Tart, ed., 1975) entitled "The Arica Training" written by Joseph Hart and John Lilly, both of whom had attended Ichazo's 1971 training; and the enneagram-related work of the late Russian philosopher and mystic Gurdjieff. Palmer testified that she never personally attended an Arica training, nor, prior to publication of *The Enneagram*, had she seen any of Arica's copyrighted materials with the exception of *Interviews*.

Arica's complaint, filed on August 6, 1990, alleged violations of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, the Lanham Trademark Act, 15 U.S.C. § 1051 *et seq.*, and claims of common law unfair competition and palming off. Judge Patterson, in a thoughtful opinion dated April 9, 1990, denied Arica's motion for a preliminary injunction to prevent release of the paperback edition of *The Enneagram. Arica Institute, Inc. v. Palmer*, 761 F.Supp. 1056 (S.D.N.Y.1991). In a second opinion entered August 6, 1991, the district court granted defendants' motion for summary judgment, *Arica Institute, Inc. v. Palmer*, 770 F.Supp. 188 (S.D.N.Y.1991), and, on August 8, 1991, entered judgment. Arica appeals from this judgment.

## DISCUSSION

At the outset, we note that on appeal of a grant of summary judgment "we apply the same standard as the district court did in deciding the Rule 56 motion and determine *de novo* whether a genuine issue as to any material fact exists" and whether the moving party was properly entitled to judgment as a matter of law. *See Taggart v. Time, Inc.*, 924 F.2d 43, 45–46 (2d Cir.1991); Fed.R.Civ.Pro. 56(c). In making this determination, we view all inferences in the light most favorable to the non-moving party and affirm only where no reasonable trier

of fact could have found in her favor. *Taggart*, 924 F.2d at 46.

## I. *The Copyright Infringement Claim.*

Arica's copyright infringement claim consists of two parts: First, Arica alleges that Palmer's text appropriates numerous words and phrases from the copyrighted materials. Secondly, Arica asserts that Palmer unlawfully reproduces the seven core Ichazo enneagrams representing the ego fixations. Arica makes this second claim in three, separate ways: (1) Palmer appropriates the *precise words* with which Ichazo has labeled his figures; (2) Palmer appropriates the *sequence* in which Ichazo's labels appear; (3) Palmer appropriates Ichazo's decision to *attach* the ego fixation labels to the enneagram figure.

To succeed in its infringement claim, Arica must demonstrate two elements: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Serv., Inc.*, — U.S. —, —, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01 at 13–4 to 13–5 (1991) [hereinafter Nimmer, *Nimmer on Copyright*]. The parties dispute only the second of these two elements. *See Arica*, 770 F.Supp. at 190.

Since direct evidence of copying is rare, a court may infer it upon a showing that defendant had access to the copyrighted work, and that the allegedly infringing material bears a substantial similarity to copyrightable elements of plaintiff's work. *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 765 (2d Cir.1991); *Warner Bros., Inc. v. Am. Broadcasting Cos.*, 654 F.2d 204, 207 (2d Cir.1981); 3 Nimmer, *Nimmer on Copyright* § 13.01[B] at 13–8 n. 26.3. Two works are substantially similar where "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal [of the two works] as the same," *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960). Accordingly, summary judg-ment may be appropriate "either because the similarity between the two works concerns only '*non*-copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros. Inc. v. Am. Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir. 1983) (citations omitted); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.), *cert. den.* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980).

We consider Arica's copyright infringement claims *seriatim.*

## A. *Infringement of Assorted Words and Phrases in the Copyrighted Materials.*

Arica has provided 368 pages to the district court, and 328 pages to this court, documenting alleged copying of words and phrases. The district court held that Palmer had access only to *Interviews*, thereby narrowing Arica's claim to the 250 or so alleged instances of copying from that work. *Arica*, 770 F.Supp. at 191. We find no error in this analysis given Arica's conceded policy of withholding its materials— with the exception of *Interviews* and the more recently published *Letters to the School*—from the general public.

We further agree with the district court that of the approximately 250 instances of alleged copying where access was found, all but twenty or so refer to single words or short phrases which do not exhibit the minimal creativity required for copyright protection. *See Arica*, 770 F.Supp. at 191–92; *accord Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir.), *cert. den.* 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987); 1 Nimmer, *Nimmer on Copyright* § 2.01[B] at 2–16.

Arica argues, on two separate grounds, that the district court erred in holding the individual words and short phrases non-copyrightable. First, it cites *Salinger*, 811 F.2d at 98, in which we held that while "the 'ordinary' phrase may be quoted without fear of infringement, a copier may not quote or paraphrase the se-

quence of creative expression that includes such a phrase." Under *Salinger*, a defendant's copying of an ordinary word or phrase is actionable where she has also appropriated enough of plaintiff's "sequence of thoughts, choice of words, emphasis, and arrangement to satisfy the minimal threshold of required creativity." *Id.* Arica fails to make this showing, however. In none of the alleged instances of copying from *Interviews* does Palmer appropriate creative expression of the sort referenced in *Salinger.* The alleged copying cited at pages 508–509 of appellant's appendix is typical. The passage from *Interviews* reads:

> The indolent type goes out looking for the love and meaning he feels deprived of; he becomes a continual seeker, but never a finder. This is his trap. He is always searching outside of himself for what can only be found within. But in a perverse way the seeker is ignorant about himself. He believes he knows all about other people and he doesn't hesitate to tell everyone else. The hell of the indolent is the worst of all the fixations because it leads to inner paralysis and indecision.

Ichazo, *Interviews* at 14. Palmer's allegedly infringing passage reads as follows:

> Nines can go along with a situation for a long time while still trying to decide. It is so easy for them to identify with another person's point of view that they can see the rightness on all sides of a question. Why take a position, when every side has merit? Why have a personal priority, when it's so easy to feel the rightness of all parties concerned? Nines say that it is easier to know the inner condition of others than it is to find a viewpoint of their own.... Because Nines obsess over a decision does not mean that they can be hurried into resolving it.... A Nine's decision is to make no decision....

Palmer, *The Enneagram* at 346–47. While these two passages arguably describe the same personality type, Palmer's expression of this idea does not appropriate Ichazo's "sequence of thoughts, choice of words, emphasis and arrangement" in such a way

as to make actionable the use of single words and short phrases. *Salinger,* 811 F.2d at 98.

▪ Arica also argues that the single words and short phrases are actionable under the doctrine of "comprehensive non-literal similarity". It relies principally on seventy pages in Appellant's Appendix showing instances in which Palmer has used the same word as Ichazo. For example, Arica cites to Ichazo's use of the word "perfectionist," and then singles out sixty-five instances in which the same word (or some variant of it) appears in *The Enneagram.* Arica argues that these repeated uses of the same word demonstrate a "comprehensive non-literal similarity" between the two works.

▪ The doctrine of "comprehensive non-literal similarity" allows copyright protection where there is no word-for-word or literal similarity but where defendant has nonetheless appropriated the "fundamental essence or structure" of plaintiff's work. *See* Nimmer, 3 *Nimmer on Copyright* § 13.03[A] at 13–24 to 25. A plaintiff succeeds under this doctrine when it shows that the pattern or sequence of the two works is similar. *See id.* at 13–27; Zechariah Chafee, *Reflections on the Law of Copyright,* 45 Colum.L.Rev. 503, 513 (1945). Arica's word-for-word comparisons do not speak to the question of whether Palmer has taken the "fundamental essence or structure" of one or more of Ichazo's works. We find the seventy Appendix pages insufficient to demonstrate comprehensive non-literal similarity.

Arica's contention that the ordering of Palmer's nine chapters mimics Ichazo's arrangement of the nine ego fixations, is similarly lacking. As we discuss in Part B.2, *infra,* for the purposes of this lawsuit we view the sequence of the fixations as an unalterable fact of nature which is not entitled to copyright protection.

▪ Twenty or so longer passages from *Interviews* remain to be considered. We agree with the district court that only three

of these passages pass the substantial similarity threshold. These three, along with

Arica, *Interviews*

"In essence ...; there is no conflict within the person between head, heart, and stomach ..." (p. 9).

"A contradiction develops between the inner feelings of the child and the outer social reality to which he must conform." (p. 9).

"Personality forms a defensive layer over the essence...." (p. 9).

the *Interviews* passages from which Palmer allegedly took them, are as follows:

Palmer, *The Enneagram*

"In essence we are like young children: there is no conflict between our thoughts, or our emotions or our instincts." (p. 18).

"A contradiction develops between the child's essential trust of the environment and the family reality, which must be obeyed." (p. 19).

"From the point of view of a psychology that includes a concept of essence, personality develops in order to protect and defend essence from injury in the material world." (p. 19–20).

---

We believe that Arica clears the twin hurdles of access and of substantial similarity with respect to these three passages and thus must decide whether Palmer has a fair use defense as to them. We discuss this question in Part C, *infra*.

B. *Infringement of the Seven Core Enneagrams.*

Arica asserts three separate theories of copyright infringement related to its seven core enneagrams.

1. Does Palmer appropriate the words used in the enneagram labels?

■ Arica first asserts that Palmer's banner listings, her chapter titles, and her enneagrams appropriate the words labelling Ichazo's seven enneagrams.

Arica has successfully established Palmer's access to five of the seven enneagrams which appear in *Interviews*, a book which Palmer admits to owning. *See* Ichazo, *Interviews*, 15, 16, 18; *Arica*, 770 F.Supp. at 191. Moreover, access through a third party is legally sufficient, *see* Nimmer, 3 *Nimmer on Copyright* § 13.02[A] at 13–13, and it is undisputed that Palmer possessed Lilly and Hart's article "The Arica Training" which contains all seven of the labeled Ichazo enneagrams. There is, at minimum, a material issue of fact as to whether Lilly

and Hart derived these figures from the copyrighted materials.

Though Arica establishes access to Ichazo's enneagram labels, and indeed substantial similarity from which copying may be inferred, it is unable to demonstrate similarity of *copyrightable* elements. We start from the "fundamental axiom of copyright law ... that 'no author may copyright his ideas or the facts he narrates.'" *Feist Publications, Inc. v. Rural Telephone Serv. Co., Inc.*, —— U.S. ——, ——, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991) (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556, 105 S.Ct. 2218, 2228, 85 L.Ed.2d 588 (1985)). Facts do not contain the requisite originality and creativity required as a *"sine qua non* of copyright." *Id.*, —— U.S. at ——, 111 S.Ct. at 1287. There is a world of difference between the creative expression of an idea or a fact and its revelation. Once the idea or fact is understood, even for the first time, the copyright laws do not protect these building blocks of knowledge from exploitation by anyone. As the Supreme Court has recently explained: "[t]he distinction is between creation and discovery: the first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence." Thus, "[f]acts, whether alone or as part of a compilation, are not original and

therefore may not be copyrighted." *Id.* at ——, 111 S.Ct. at 1290.

Arica publications repeatedly assert that Ichazo has "discovered" the ego fixations, which are scientifically verifiable "facts" of human nature. For example, in *Letters to the School,* a 1988 publication of the Arica Institute Press containing four Ichazo letters purporting to "clarif[y] what the Arica School represents," Ichazo, *Letters to the School* 9 (1988), Ichazo states that "[t]he nine fixations, as well as the entire Arica system, are based upon our proven scientific knowledge...." *Id.* at 84. He continues: "[b]ecause of this, I am not coming from thin air or inventing anything. I am making descriptions ... and this makes the entire system scientific, provable in the laboratory and clinically." *Id.* He disavows having invented the enneagrams, asserting that they constitute "a discovery as scientific discoveries are, with exactly the same qualification of being verifiable and objective.... [They] reflect something real in human nature itself. We feel that the categories have been discovered rather than invented." *Id.* at 71. Presented with this quotation at trial, Elliot Dunderdale, Arica's Executive Director, agreed with it.

On appeal, Arica argues that its statements are only metaphoric claims of philosophical truth. Having expressly represented to the world that Ichazo's theories are factual, however, Arica is not now permitted to make an inconsistent claim so as to better serve its position in litigation. *See* Nimmer, 1 *Nimmer on Copyright,* § 2.11[C] at 2–163 to 165; *Huie v. National Broadcasting Co.,* 184 F.Supp. 198, 200 (S.D.N.Y.1960). That a reasonable reader might not believe the representation does not negate the estoppel. *See* Nimmer, 1 *Nimmer on Copyright* § 2.11[C] at 2–165; *Houts v. Universal City Studios, Inc.,* 603 F.Supp. 26, 29–31 (C.D.Cal.1984) (absurd stories); *Oliver v. St. Germain,* 41 F.Supp. 296, 299 (S.D.Cal.1941) (revelations to author by Tibetan spirit). Thus, for the purposes of this lawsuit, we must assume that Ichazo has "discovered" the ego fixations. The alleged similarity between Ichazo's and Palmer's references to the personality types, therefore, relate only to factual, *non*-copyrightable elements. Judge Patterson properly awarded summary judgment to defendants on this point.

**2. Does Palmer appropriate the sequencing of the fixations?**

■ Arica next alleges that the words used in Palmer's banner listings and on her enneagrams duplicate the sequential relationship among Ichazo's labels, and that this *sequencing* is copyrightable. The district court found non-copyrightable "the sequence or arrangement of the ego fixations within [Ichazo's] system." *Arica,* 770 F.Supp. at 191; *accord Arica,* 761 F.Supp. at 1063.

■ An original *expression* of facts is copyrightable, even where the facts themselves are not. 1 Nimmer, *Nimmer on Copyright,* § 2.11[B] at 2–159. Thus, a sufficiently creative sequence will merit copyright protection. *See Feist,* —— U.S. at —— – ——, 111 S.Ct. at 1289–90; *Victor Lalli Enterprises, Inc. v. Big Red Apple, Inc.,* 936 F.2d 671, 673 (2d Cir.1991); *Wainwright Sec. Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 95–96 (2d Cir.1977), *cert. den.* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). Our decision in *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 978 (1980), in which we quoted Judge Learned Hand's statement that "[t]here cannot be any such thing as copyright in the order of presentation of the facts, nor, indeed, in their selection," is not to the contrary. Both *Hoehling* and the case it quotes, *Myers v. Mail & Express Co.,* 36 C.O.Bull. 478, 479 (S.D.N.Y.1919), dealt with historical works containing chronological narrations of events. Since "the narration of history must proceed chronologically," *id.,* this ordering is inevitable and thus is devoid of creativity. *See Feist,* —— U.S. at ——, 111 S.Ct. at 1297. In such circumstances sequence is non-copyrightable, but it need not be so in all cases. *Cf.* Nimmer, 1 *Nimmer on Copyright,* § 2.11[D] at 2–167 & n. 28.

While sequences of fact presentation may in appropriate cases merit copyright protection, Ichazo's sequence lacks the req-

uisite originality. Arica has stated elsewhere that the series of fixations is a "natural declension" comparable to "the spectrum of colors," and that "the sequence of the series cannot be changed at will by subjective preference." Ichazo, *Letters to the School* 74 (1988). Thus, for the purposes of this lawsuit we take Arica at its word and assume that the sequence of the fixations, like the fixations themselves, is an unalterable fact, the product of discovery and not creativity. As such, it is a "practically inevitable" ordering, *Feist,* —— U.S. at ——, 111 S.Ct. at 1297, which embodies no creativity and is non-copyrightable. *See Feist,* —— U.S. at ——, 111 S.Ct. at 1297 (listing of phone numbers in alphabetical order is "practically inevitable" sequence not entitled to copyright protection); *Victor Lalli,* 936 F.2d at 673 (mechanical or typical ordering is "devoid of creativity, and therefore undeserving of copyright protection"); *Hearn v. Meyer,* 664 F.Supp. 832, 851 (S.D.N.Y.1987) ("a thematic presentation, structured chronologically, is not copyrightable"). The district court did not err in holding non-copyrightable the sequence of ego fixation labels.

3. Did Palmer appropriate the decision to present the series of fixations as points on an enneagram figure?

▮ Ichazo's attachment of labels to the enneagrams presents a different angle on copyrightability. As noted above, an "original selection or arrangement" of facts is copyrightable even where the facts themselves are not. *See Feist,* —— U.S. at ——, 111 S.Ct. at 1289. To meet this standard, plaintiff need only demonstrate "that the work was independently created by the author ... and that it possesses at least some minimal degree of creativity." *Id.* at ——, 111 S.Ct. at 1287.

Ichazo concededly did not originate the centuries-old enneagram figure, a nine-pointed star within a circle with straight lines connecting the various points. Defendant's own statements, however, create a genuine issue of material fact as to whether Ichazo was the first to label the nine points and to use their connecting lines to express relationships between various personality types. Palmer testified, for example, that while Gurdjieff used the nine-pointed figure only Ichazo's figures have "words ... descriptions attached to each of these seven [enneagrams]." Gurdjieff's figures contain no words "just the star itself, the diagram." Palmer has also written that "Ichazo had placed the types correctly on the nine-pointed star, so that the relationships among the types could be verified through interviews". Palmer, *The Enneagram* at 47.

▮ Palmer argues that the idea of diagramming the personality types to express their proper relationships can be expressed in so few ways that "protection of the expression would effectively accord protection to the idea itself." *Kregos v. Associated Press,* 937 F.2d 700, 705 (2d Cir.1991). The roots of this "merger" doctrine can be found in such cases as *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879), in which the Supreme Court held unprotected an author's lined ledger sheets where the sheets were necessary to the application of the author's accounting system and protecting them would have afforded copyright protection to the underlying system itself. *See also Morrissey v. Proctor & Gamble Co.,* 379 F.2d 675, 678–79 (1st Cir. 1967) (where topic requires certain means of expression, that expression is non-copyrightable). The current case, however, does not present such a "merger" of idea and expression. Ichazo could have diagramed the ego fixations in any number of ways including, for example, a numbered listing of the nine fixations with arrows drawn to represent the relationships among them. Palmer's own diagram of the "three core mental preoccupations" and their "wing points" provides another such example. *See* Palmer, *The Enneagram* at 42. Protecting Ichazo's decision to label the enneagram will not preclude others from developing their own ways of presenting this information. "Since there are various ways of expressing that general idea, the merger doctrine need not be applied to assure that the idea will remain in the public domain." *Kregos,* 937 F.2d at 707.

We believe that Ichazo's attachment of labels to the enneagram figure contains the minimal degree of creativity necessary to make it copyrightable. *See Nikanov v. Simon & Schuster*, 246 F.2d 501, 503–504 (2d Cir.1957) (holding copyrightable plaintiff's unique arrangement of Russian alphabet in chart designed to teach Russian to English speakers); *Deutsch v. Arnold*, 98 F.2d 686, 688 (2d Cir.1938) (A. Hand, J.) (chart linking handwriting and personality characteristics held "an arrangement and combination in new form [which] was clearly an original work within the meaning of the copyright law"); *Pantone, Inc. v. A.I. Friedman, Inc.*, 294 F.Supp. 545, 548 (S.D.N.Y.1968) (chart conveying color matching system held "to possess sufficient originality and uniqueness in its embodiment of its mode of expression to qualify it for copyrightability"); *accord* 17 U.S.C.A. § 102(a)(5) (West Supp.1992) ("pictorial, graphic and sculptural works" entitled to copyright protection). Accordingly, the district court erred when it failed to recognize this copyrightable element.

### C. *Fair Use*

Arica has established the elements of copyright infringement, to a degree sufficient to withstand summary judgment, with respect to Palmer's unauthorized use of the above-quoted three passages from *Interviews* and with respect to her use of Ichazo's decision to attach labels to the enneagram figure. Before finding her liable, however, we must examine whether hers was a "fair use." *See* 17 U.S.C.A. § 107 (West Supp.1992).

■■■■■ The "fair use" exception applies where the Copyright Act's goal of encouraging creative and original work would be better served by allowing the use than by preventing it. *See Iowa State Univ. Research Found. v. Am. Broadcasting Cos.*, 621 F.2d 57, 60 (2d Cir.1980). We determine fair use on a case-by-case basis, *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 549, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985), after consideration of four, non-exclusive, statutorily-defined factors:

(1) the purpose and character of the use;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107 (West Supp.1992); *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735–36 (2d Cir.1991). The district court found that Palmer made "fair use" of the three longer passages from *Interviews*. We review *de novo* this mixed question of fact and law, *New Era Publications Int'l, ApS v. Carol Publishing Group*, 904 F.2d 152, 155 (2d Cir.), *cert. den.* —— U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990), and at the same time consider whether copying Ichazo's attachment of the ego fixation labels to the enneagram figure is a fair use.

1. The purpose and character of the use.

■■■■ Where defendant's use is for the purposes of "criticism, comment ... scholarship [or] research," 17 U.S.C.A. § 107 (West Supp.1992), there will be a "strong presumption that factor one favors the defendant." *Wright*, 953 F.2d at 736.

We agree with the district court that Palmer's use of the Arica materials fits easily into all four of these categories. *See Arica*, 770 F.Supp. at 195. The first four chapters introduce the historical and theoretical underpinnings of the enneagram figure. Each of the next nine chapters, which range in length from 19 to 39 pages, elaborate on a given personality type. These discussions, while they include aspects of Ichazo's work, go well beyond it. Palmer testified that she drew on her work with Naranjo, as well as on "an immense amount of material that never was developed through either man, but came through many, many interviews of people with whom I work and from whom I take their stories." Transcript at 222–23. Excerpts from these interviews appear throughout the nine chapters as illustrations and explanations of the nine personality types. Finally, an appendix entitled

"Empirical Research on the Enneagram" summarizes studies, including Palmer's own involving 172 subjects, that have sought to document the personality types and analyze them within the framework of modern theories of personality. Palmer thus builds upon Ichazo's work to further develop our store of knowledge in this area. This use fits the purposes described in section 107 and we accordingly grant it a strong presumption under the first factor.

This presumption is not, as Arica argues, offset by Palmer's concurrent commercial purpose. The presumption stands "even though, as will often be the case, the [defendants] 'anticipate profits.'" *Wright,* 953 F.2d at 736–37 (citation and parenthetical omitted). We find that factor one favors the defendant.

2. Nature of the copyrighted work.

"Whether or not a work is published is critical to its nature under factor two because 'the scope of fair use is narrower with respect to unpublished works.'" *New Era,* 904 F.2d at 157 (quoting *Harper & Row,* 471 U.S. at 564, 105 S.Ct. at 2232). *Interviews,* which contains the three passages as well as five of the seven enneagrams, is a published work available to the general public. We therefore agree with the district court that the second fair use factor, the "nature of the copyrighted work," favors Palmer. *See Arica,* 770 F.Supp. at 195.

3. Amount and substantiality of the portion of the copyrighted work used.

The third fair use factor requires us to evaluate the "amount and substantiality" of defendant's use of the copyrighted work. *Wright,* 953 F.2d at 738. The district court properly determined that the three passages "constitute a minor if not minuscule portion of ... *Interviews with Oscar Ichazo.*" *Arica,* 770 F.Supp. at 195; *see also Consumers Union of U.S., Inc. v. General Signal Corp.,* 724 F.2d 1044, 1050 (2d Cir. 1983), *cert. den.* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984) (use of 29 words from 2100 word article held insubstantial).

We consider, in addition, Ichazo's attachment of labels to the enneagram figure. Arica argues that these figures constitute the "heart" of *Interviews.* *See Harper & Row,* 471 U.S. at 564–65, 105 S.Ct. at 2232–33. This argument, however, misdefines the issue. The nine-pointed figure, the labels and their sequence, taken separately, are non-copyrightable. We need consider only Ichazo's creative decision to link the labels with the figure. That decision is insubstantial in relation to the work as a whole. The third factor favors defendants.

4. Effect of the use upon the potential market for or value of the copyrighted work.

The fourth factor, which the Supreme Court has termed "the single most important element of fair use," *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233, asks us to evaluate economic impact of the use upon the copyright owner. We do not share the district court's certainty that *The Enneagram,* a "psychological self-help tool," will not compete with *Interviews,* "a biography." *Arica,* 770 F.Supp. at 195. Both works might well interest those pursuing emotional and psychological self-help. Nonetheless, we believe that the fourth factor favors defendants. As we recently stated in *Wright,* the relevant market effect is that which stems from defendant's use of plaintiff's "expression," not that which stems from defendant's work as a whole. *Wright,* 953 F.2d at 739. Defendant, after all, is perfectly entitled to create a competing work. The copyright statute simply constrains her from using plaintiff's original expression in doing so. Thus, in cases such as this where a meaningful distinction may be drawn between the infringing portions of defendant's work and the work as a whole, we need only consider the market effect of the infringing portions: the three passages and the decision to combine the labels with the enneagram figure. We find that these infringing aspects of *The Enneagram* will have a negligible effect on the market for *Interviews.* Where "marginal amounts of expressive content were taken from [plain-

tiff's] works ... [i]mpairment of the market for these works is unlikely." *Id.*

In sum, we find that all four of the fair use factors favor defendants. While defendant "need not 'shut out' her opponent on the four factor tally to prevail," *Wright,* 953 F.2d at 740, if she does so, victory on the fair use playing field is assured.

We accordingly find no error in the district court's grant of summary judgment to defendants on the copyright infringement claim. We have reviewed the district court's dispositions of the Lanham Act and common law unfair competition/palming off claims, and find them to be similarly without error.

Judgment affirmed.